**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| BRITTNEY KENNEDY, Individually as Surviving Spouse, and on behalf of minor M.S.K., and as Anticipated Personal Representative of the Estate of MARQUIS KENNEDY,<br><br>          Plaintiffs,<br><br>     v.<br><br>SHELLY BATEMAN, JONATHAN P. BUCEK, RICHARD COLEMAN, TYLER FERRELL, PATRICK KNIGHT, DAVID KURBINSKY, MICHAEL LEONESIO, LEONARD RAY, RONNIE MCCOY, BOBBY MUGUEZA, OFFICER NORWOOD, LEONARD RAY, CONNOR SHANAHAN, SEAN WHEATLEY, JASTIN D. WILLIAMS, BRADLEY MCNULTY, JOHN DOE, THE CITY OF ARLINGTON, TEXAS, THE ARLINGTON POLICE DEPARTMENT, D/B/A ARLINGTON BASIC POLICE TRAINING ACADEMY, CITY OF ARLINGTON PURCHASING DEPARTMENT, AND GRACIE UNIVERSITY,<br><br>          Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>**CIVIL ACTION NO. 4:24-cv-208-P**<br>**JURY DEMAND REQUESTED** |

---

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

---

**COMES NOW**, BRITTNEY KENNEDY, Individually as Surviving Spouse, and on behalf of minor M.S.K. and as Anticipated Personal Representative of the Estate of MARQUIS SHAMAR KENNEDY, deceased ("Plaintiffs"), complaining of the following licensed City of Arlington, Texas police officers in their individual capacities: SHELLY BATEMAN, JONATHAN P. BUCEK, RICHARD COLEMAN, TYLER FERRELL, PATRICK KNIGHT,

DAVID KURBINSKY, MICHAEL LEONESIO, LEONARD RAY, RONNIE MCCOY, BOBBY MUGUEZA, OFFICER NORWOOD, CONNOR SHANAHAN, SEAN WHEATLEY, JASTIN D. WILLIAMS, BRADLEY MCNULTY and JOHN DOE; THE CITY OF ARLINGTON, TEXAS; and, GRACIE GLOBAL, LLC d/b/a GRACIE UNIVERSITY, hereinafter called "Defendants" and for causes of action will show the Court and Jury as follows:

## I. <u>INTRODUCTION</u>

This case arises out of the tragic and wholly avoidable death of an Arlington Police Department Cadet in Training, Marquis Kennedy on September 23, 2022 at the hands of Arlington Police Officers who were charged with his training.  In week 10 of a 16-week training course, the City's officer training involved a sequence of physical altercation exercises with Arlington Police Officers known informally as the "Fight for Your Life" simulation in which cadets are required to engage in physical struggles with fellow officers.  Those struggles, which involved jiu-jitsu holds, choke holds, compression holds, punches, and body blows with officers' knees, lasted for approximately 15-16 minutes, and involved four difference Arlington Police Officers taking turns fighting with Cadet Kennedy.  During this time, Cadet Kennedy was provided no breaks and no water, despite pleas for both.  This training component is well-supervised by a number of other officers.

Although it was apparent well before this time, the officers affirmatively recognized during the fourth simulation/altercation that Cadet Kennedy was in need of an ambulance.  But, rather than call one, the officers simply place Cadet Kennedy in the break room where he proceeded to stop breathing, lost consciousness, and eventually died.  Cadet Kennedy's widow and his minor child bring this lawsuit against the individual officers who were involved, and the City of Arlington, for the violation of Marquis Kennedy's rights under the Fourth and Fourteenth

Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.  Plaintiffs also bring this lawsuit against Gracie Global, LLC, the entity that trained and certified the Arlington Police Officers who conducted the training, for their negligence and gross negligence in training and certifying those officers.

## II. <u>PARTIES</u>

1. Plaintiff**, BRITTNEY KENNEDY**, is the surviving spouse of the late MARQUIS SHAMAR KENNEDY ("Fallen Officer Kennedy"). Plaintiff is a resident of DeSoto, Texas and is the proper party to bring this wrongful death and survival action in her individual capacity as next friend for their only child, 2-year-old M.S.K., and is the representative of the Estate of MARQUIS SHAMAR KENNEDY, born 05/28/1982, who, at all times pertinent to this matter, was a Police Officer.

2. Defendant **Shelly Bateman**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Bateman may be served at the City of Arlington, in care of the Arlington Police Department,  at 101 W. Abram St., Arlington, Texas 76010, or wherever she may be found.

3.  Defendant **Jonathan P. Bucek**, upon information and belief,  is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Bucek may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

4. Defendant **Richard Coleman**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Coleman may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**5.** Defendant **Tyler Ferrell**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Ferrell may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**6.** Defendant **Patrick Knight**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Knight may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**7.** Defendant **David Kurbinsky**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Kurbinsky may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**8.** Defendant **Michael Leonesio**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Leonesio may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**9.** Defendant **Leonard Ray**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Ray may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**10.** Defendant **Ronnie McCoy**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  McCoy may be served at

the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**11.** Defendant **Bobby Mugueza**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Mugueza may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**12.** Defendant **Officer Norwood**,[1] upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Norwood may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**13.** Defendant **Connor Shanahan**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Shanahan may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**14.** Defendant **Sean Wheatly**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Wheatly may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**15.** Defendant **Jastin D. Williams**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington.  Williams may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

---

[1] At this time, Officer Norwood's first name is unknown.

**16.** Defendant **Bradley McNulty**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington. McNulty may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**17.** Defendant **John Doe**, upon information and belief, is a resident of Arlington, Texas and a licensed police officer employed by the City of Arlington. Doe may be served at the City of Arlington, in care of the Arlington Police Department, at 101 W. Abram St., Arlington, Texas 76010, or wherever he may be found.

**18.** Defendant, **City of Arlington Texas**, (the "City"), located at 101 W. Abram St., Arlington, Texas 76010, is a governmental entity and a political subdivision of the State of Texas and is a "person" for purposes of 42 U.S.C. § 1983. The City funds and operates the Arlington Police Department, and the mayor serves as the City's chief administrator who is responsible for carrying out the actions and policies of the day-to-day operation of the organization. The City has been served and entered an appearance in this case.

**19.** Defendant**, Gracie Global, LLC d/b/a Gracie University**, is a privately-owned, for-profit company headquartered in Torrance, California and authorized to do business in Texas. They provide online and in person "certification" courses for law enforcement officers and provided the certification of several of the officers involved in the death of Marquis Kennedy. Gracie Global has been served and enterd an appearance in this case.

### III. <u>JURISDICTION AND VENUE</u>

**20.** This Court has jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343 as this action is brought under the Fourth and Fourteenth Amendments to the U.S. Constitution, through

42 U.S.C. §1983, for the deprivation of the rights and privileges guaranteed to Marquis Kennedy by these constitutional and statutory provisions.

**21.** This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims against Defendant Gracie Global as these claims are related to Plaintiff's federal claims as to form the same case or controversy under Article III of the U.S. Constitution. Alternatively, this Court has jurisdiction over the claims against Gracie Global pursuant to 28 U.S.C. § 1332(a) because those claims involve a controversy between parties of diverse citizenship and an amount in controversy that exceeds $75,000.

**22.** Venue is proper in this Court because the incident made the basis of this lawsuit occurred within this division of the Northern District of Texas.

## IV. <u>FACTS</u>

**23.** Fallen Officer Kennedy was a smart, well-educated, qualified, and apparently healthy forty-year-old male hired to serve and protect the community. *Exhibit A - Photo of Fallen Officer Kennedy taken the week he died.*

**24.** On May 20, 2022, ten weeks prior to Fallen Officer Kennedy's death, a pre-employment physical examination by Concentra Medical Centers per the Concentra agreement with the City Defendant, deemed Fallen Officer Kennedy healthy and fit for training and recorded his vital statistics as follows:

> BP 128/78. Pulse 72. RR 16. Height: 74. Weight: 224. Body Mass Index (BMI): 28…May work without limitations/restrictions." *Exhibit B - Pre-Training Physical.*

**25.** The City has a Class Schedule for recruits. *Exhibit C - Class Schedule*. The schedule includes topics to be covered and the instructors who will be teaching each topic and specific start and end times for both the day and the periods of instruction.

**26.** For several weeks prior to September 19-23, 2022, the training Schedule was not followed, and Cadets aged 35 and older were treated differently than the younger Cadets. Some of these Cadets were told they had to "fight for their life" to keep their jobs and some Cadets "actually fought for their life" see *Exhibit D - News Article.*

**27.** The schedule for the week of September 19-22, 2022, required the cadets, including Officer Kennedy, to train for the "fight for your life" simulation, scheduled for Friday September 23, 2022:

> **a. Monday –** Defendant Cpl. Jastin Williams supervised Cadet wrestling sessions which were intra-Cadet and were held in 2 sessions totaling 7 hours.
>
> **b. Tuesday –** Again, Defendant Cpl. Jastin Williams supervised Cadet wrestling sessions which were intra-Cadet and lasted for 4 hours.
>
> **c. Wednesday –** There was no physical training.
>
> **d. Thursday –** Fallen Officer Kennedy complained to one of the trainers about being injured. Fallen Officer Kennedy was unable to remain upright and alert during classes. He was subjected to the "5:00 club," a Cadet hazing ritual, which required more after-hours, rigorous physical activity. This activity was not published in the Cadet training schedule and occurred when Cadets fell asleep during class.

**28.** By the end of training on Thursday, September 22, each member of the Instructor staff were aware of the poor physical condition of Fallen Officer Kennedy, and of his injuries.

**29.** On Friday, September 23, 2022, *see* Exhibit C (Class Schedule), from approximately 10:00 a.m. until approximately 10:16 a.m., Fallen Officer Kennedy, as a police officer in the line of-duty, was subjected to "Gracie Survival Tactics" jiu-jitsu combat training which included being placed in Gracie University designed jiu-jitsu submission holds, choke holds, compression holds, punches and wrestling, and being *continuously* attacked for 15-16 minutes by 4 Gracie-trained, hydrated, rested, protective gear-wearing instructors/Police Officers. During this, Fallen Officer Kennedy was denied water despite requesting it. He was not permitted any breaks, was put into

positions which denied him air, carried the full weight of the trainers on his chest, was repeatedly punched, and it was made clear to him if he failed to continue, he would fail and must repeat the entire physical training program. Despite his repeated complaints of lightheadedness, thirst, fatigue and his obviously increasingly poor health, his requests for care were met with instructor denials for a sustained period. Fallen Officer Kennedy collapsed after repeated body compressions and repeated head and body blows with a 200 lbs. officer mounted on his abdomen and neck while fully exerting himself for an extended amount of time - all "in the context of jiu-jitsu training..."

**30.** The "fight for your life" training protocol is a requirement for Cadets. Testimony by former Cadets will show that Cadets who do not or cannot complete the simulations consecutively are forced out of the Academy, even though the Academy itself states that this is not required. Each Cadet moves through the simulations alone, other Cadets are not permitted to watch and so the simulations could be, and were, "adjusted" for each Cadet. Favored Cadets easily coast through the simulations, but disfavored Cadets are subjected to ferocious physical attacks by the instructors. Cadets are given an "Officer in Distress" card to drop if they are unable to continue. Fallen Officer Kennedy was required to continue through the 4 simulations, even though multiple Instructors visibly and audibly noted that Fallen Officer Kennedy was nearly unable to articulate that he needed a break, water, and physically was unable to continue.

**31.** The "fight for your life" simulations were as follows:[2]

 **a.** "Fight For Your Life" **Simulation 1** was led by Defendant Cpl. Jastin Williams. Cpl. Williams was a large, fit, experienced officer who was a Gracie Survival Tactics Level 2 certified instructor. For the simulation he was wearing Mixed Martial Arts ("MMA") gloves and a mouthguard. Cpl. Williams knew Fallen Officer Kennedy had been hazed and injured earlier in the week and knew that he showed signs of extreme fatigue in the classroom the morning of the simulation. Cpl. Williams began Simulation 1 in a mounted position, on top of Fallen Officer Kennedy who was laying on his back on the mat. Cpl. Williams had all his body weight on Fallen

---

[2] Exhibit E: Affidavit of Wife, Brittney Kennedy, describing viewing the recording of the "Fight For Your Life" with Defendant Cpl. Williams and Defendant Sgt Michael Leonesio.

Officer Kennedy's torso and is seen punching Fallen Officer Kennedy in the face and body. Per Academy policy, the *Cadets cannot punch back* but can only lift their hips (hip bump) to attempt to roll the opponent off their body. Fallen Officer Kennedy was struck in the hips and abdomen, deprived of air with the Corporal's full weight on his abdomen, could not breathe, was not allowed to fight back and was unable to execute the hip bump. Fallen Officer Kennedy suffered having the weight of a large man on his torso while fully exerting himself for approximately 3 minutes and 38 seconds with no break, until Simulation 2 began. *Id.*

b. "Fight For Your Life" **Simulation 2** was performed by a Gracie Survival Tactics Level I Instructor, Jonathan Bucek, who had rested since the last Cadet came through his station - at least 15 minutes. The instructor knew Fallen Officer Kennedy was exhausted and injured and had observed Cpl. Williams "fighting" him during simulation 1. The instructor began the simulation with a choking armbar across Fallen Officer Kennedy's neck while laying on him with his full body weight while Fallen Officer Kennedy was again lying flat on his back. Again, per Academy policy, the *Cadets cannot punch back* but can only lift the hips (hip bump) and use their hands to attempt to roll the opponent off their body. The instructor struck Fallen Officer Kennedy in the hips and abdomen, deprived him of air both by compressing his chest and by putting an arm across his neck. Fallen Officer Kennedy could be heard groaning in agony and suffered this for approximately 4 minutes without pause until Simulation 3 began. *Id.* At the end of this Simulation Cpl. Williams and Academy Policy Coordinator Cpl. Shelly Bateman say that Fallen Officer Kennedy was very tired but they did not stop the simulations, or offer water, or even ask Fallen Officer Kennedy if he was okay, even as he was bent over, panting, and asking for water. The instructors refused to allow him water and told him to keep going. *Id.*

c. "Fight For Your Life" **Simulation 3** was led by a Gracie Survival Tactics Level I instructor, David Kurbinsky, who had observed Simulation 1 and 2, had seen Fallen Officer Kennedy bent over, who had heard him groaning and asking for water, and who was fully rested. Fallen Officer Kennedy was unable to resist the instructor, was visibly exhausted and could not recall the techniques he was trained on earlier in the week. As a result, the Simulation 3 instructor verbally told him which techniques to complete, and Fallen Officer Kennedy was still not able to perform them. This simulation again started with Fallen Officer Kennedy on his back on the mat with the instructor on top of him, crushing his torso and restricting his ability to breathe. Fallen Officer Kennedy, in fear of losing his livelihood, continued to submit to the instructor beating for approximately 4 minutes, with no break. *Id.*

Cpl. Williams audibly commented during simulation 3, that "he's tired," but other fighting instructors or evaluators suggested that he was faking injury. The instructors tell him to continue. Fallen Officer Kennedy cannot walk correctly, rather he is staggering and leans against a wall, but the instructors disregard this obvious notice of his physical injury and condition. *Id.*

**d.** "Fight For Your Life" **Simulation 4** was conducted by a fully rested Gracie Level 1 trainer, Bradley McNulty, who knew Fallen Officer Kennedy was injured as he had observed the previous 3 instructors injuring him. Simulation 4 began when the McNulty stood Fallen Officer Kennedy up against a wall. McNulty, who was wearing boxing gloves and headgear, a mouth guard and chest protection, repeatedly punched Fallen Officer Kennedy in the head. Fallen Officer Kennedy appears nearly unconscious. Per the Academy policy, the Cadets are now allowed to "Fight For Your Life." i.e. they may now punch the instructors.

Kennedy had to be prompted to begin round 4, and he drops his "officer in distress" card after he is punched twice in the head. An instructor pushes the card away with his foot. After the card is dropped, Fallen Officer Kennedy is punched in the head approximately 10 more times. After about 25 seconds of Simulation 4, when it is clear Fallen Officer Kennedy cannot continue, the simulation is stopped. Officer Patrick Knight asks Kennedy if he needs an ambulance. Fallen Officer Kennedy says "Yes". Fallen Officer Kennedy is unable to independently stand or walk and requires 2 people to carry him out of the room and out of view of any cameras. *Id.*

**32.** Once the simulation was stopped and Fallen Officer Kennedy was carried away the filming stopped and there is no record of any kind for approximately the next 10 minutes.

**33.** On information and belief, Fallen Officer Kennedy was placed on a chair in the break room. There instead of a trained first responder, an untrained Cadet was left to care for him. Fallen Officer Kennedy stopped breathing, lost consciousness, and fell off the chair, landing on his head.

**34.** For a period exceeding 5 minutes Fallen Officer Kennedy did not receive proper first aid, and as a result for a period exceeding 5 minutes Fallen Officer Kennedy did not receive oxygen.

**35.** The first call by Cpl. Shelly Bateman to dispatch at 10:24 a.m. exhibits the general lack of concern displayed by the instructors and evaluators when she blithely describes Fallen Officer Kennedy as "a little overheated" and, with an audible lack of urgency, requests EMS. *Exhibit F - 1st call for EMS.*

**36.** At 10:28 a.m. Cpl. Bateman again calls dispatch, this time sounding urgent. She states that Fallen Officer Kennedy is not breathing and that they have begun CPR and are attempting to use the AED to revive him. *Exhibit G - 2nd call for EMS.*

**37.** It is unclear from the record when CPR was begun on Fallen Officer Kennedy. What is clear is that CPR was started too late. The level of brain and organ damage suffered by Fallen Officer Kennedy could only have occurred after being deprived of oxygen for more than 5 minutes.

**38.** At 10:36 a.m. an officer calls dispatch to verify that EMS will be "waved" at the gate and requesting an update for when they arrive. This is twelve minutes after EMS was initially requested. *Exhibit H Wave EMS Through.*

**39.** Upon their arrival at the Academy, EMTs observed pulseless electrical activity in Fallen Officer Kennedy and lifesaving measures, including intubation, began.

**40.** According to the EMT's notes, made at around 10:40 a.m., EMTs observed that Fallen Officer Kennedy was suffering from respiratory failure, which suggests there was an extended period of anoxia and hypoxemia that resulted in a cascade of organ failure. After 7 minutes of treatment, the EMT noted that Fallen Officer Kennedy had no pulse, and a low respiratory rate, and EMTs could not obtain his blood pressure.

**41.** Around or after 10:50 a.m., according to the EMT records, over 30 minutes after the submission holds began, the EMTs were able to resuscitate Fallen Officer Kennedy using oral intubation. He was unable to protect his own airway because of the extended period of anoxia, and hypoxemia, and thus began a cascade of organ failure.

**42.** Around or after 10:52 a.m., prior to arrival at the Medical Center of Arlington Emergency Room ("ER"), the EMTs notes reflect that Fallen Officer Kennedy was not obese or overweight, which contradicts the autopsy. The EMTs recorded Fallen Officer Kennedy's height

at 6'3" with a weight of 194 pounds, which according to the National Institutes of Health, is a *normal* weight, and 28 lbs. *below* the previous weight recorded by Concentra's Matthew Scott M.D. In other words, Fallen Officer Kennedy was in better physical condition than when he was hired.

43. Upon arrival at the ER at 11:09 a.m., and for the next 30 minutes, multiple medical ER professionals medically confirmed that Fallen Officer Kennedy's previously made complaints of lightheadedness and dizziness were valid indications of medical injury. Those ER professionals were not deliberately indifferent to responding to those complaints. They began caring for the resuscitated patient.

44. After being intubated by the EMTs, Fallen Officer Kennedy never regained consciousness. According to medical records, Fallen Officer Kennedy's Glasgow Coma Scale score was a 3 and remained a 3 until his death. A 3 is the lowest possible score and indicates a severe brain injury and the necessity for intubation.[3]

45. Around 11:55 a.m. ER professionals recorded that Fallen Officer Kennedy suffered a serious "blunt abdominal injury, an acute kidney injury and an air embolism in portal vein of the right pelvic area" which likely triggered a hemoperitoneum, observing: "a gaseous distention of the stomach and small bowel. ... Gas within the venous system can be seen in the setting of ischemic bowel."

46. Based on information and belief, the ischemic bowel (the large intestine) damage most likely stemmed from the extended lack of oxygen which was the result of the delay in the instructor's performance of CPR, which deprived the vital organs of oxygen from the blood cells.

---

[3] "The Glasgow Coma Scale (GCS) is used to objectively describe the extent of impaired consciousness in all types of acute medical and trauma patients. The scale assesses patients according to three aspects of responsiveness: eye-opening, motor, and verbal responses." Shobhit Jain & Lindsay M. Iverson, Glasgow Coma Scale, NCBI (June 20, 2021), available at https://www.ncbi.nlm.nih.gov/books/NBK513298/.

47. By 11:59 a.m., less than 2 hours after the "jiu-jitsu training," ER medical professionals stated: "There is evidence of end organ damage. There is a high probability of imminent or life-threatening deterioration in the patient's condition."

48. Based on the radiological studies obtained between 09/23/2022 to 09/25/2022, initial cardiac enzymes and BNP were unremarkable. Fallen Officer Kennedy's EKG revealed only sinus tachycardia without ischemic changes.

49. Fallen Officer Kennedy fought for his life for 48 more agonizing hours, with Plaintiff, his wife Brittney, by his bedside, receiving calls and visits from friends and family members, distressed Cadets (some of whom resigned), but none from the instructors. Fallen Officer Kennedy, an Arlington City Police Officer, succumbed to his injuries on September 25, 2022.

50. On September 30, 2022, 5 days after his death, and while working under the same operational budget as the APD, the forensic examiner performed an autopsy, IFS 22-19363, which opens with: "Decedent was 280 lbs., 74 inches tall and a BMI of 34.99."[4] The inference or suggestion from the opening **false statement** in the Forensic Examiner record, is that Fallen Officer Kennedy was ***morbidly obese***. The forensic examiner's opening statement was false and contradicts multiple recent medical records. Whether the statement was explainable error or minor error, it is an inexcusable error.

51. The Investigation Narrative written by the medical examiner includes the information that Fallen Officer Kennedy had his breathing cut off in the time leading up to his inability to breathe independently. "When asked about air circulation restraints, Lt. Daniels stated he did not

---

[4] The forensic examiner record repeats the false statement of Decedent's weight in the 4th sentence of the Forensic Examiner record: "The body…weighs 280 lbs. and is 75 inches long."

believe **much** air was cut off." (emphasis added) *Exhibit I Office of the Medical Examiner Investigation Narrative.*

52. On October 5, 2022, away from his peers, after reviewing the autopsy report, and a month after the death of Fallen Officer Kennedy, Dr. Khan, who had seen Kennedy within three hours of Defendant Bateman's 911 call and found no signs of cardiac arrest, begrudgingly agreed with the forensic examiner, stating that the primary cause of death was "unknown etiology of cardiac arrest, but possible atherosclerotic cardiovascular disease and secondary cause of death as natural causes." *Exhibit J- Death Certificate.*

53. Fallen Officer Kennedy wrongfully died in the line of duty from a combination of deliberate indifferent to known medical distress and an abject failure to render medical care to treat the condition created by the Arlington Police Officers who caused it by using excessive force— i.e., strangling and asphyxiating Kennedy, compressing his body with their own body weight and force, applying blows to Kennedy's head and body, and causing Kennedy massive overexertion which led to an oxygen deprived brain (anoxia), ischemic bowel and the consequential multi-system organ failure. This manner in which this death resulted was consistent with how Arlington Police Officers are trained by the City and Gracie Global. The City did not, but should have, also trained its officers to know when a cadet was in medical distress and how to treat it before causing serious bodily injury and death, particularly given that the Arlington Police Officers were trained by the City to conduct the training in this dangerous manner. These failures on the part of the City were the moving force behind the violations of Kennedy's constitutional rights. Gracie Global's improper and inadequate training was also a proximate cause of the injuries suffered by, and ultimate death of, Marquis Kennedy.

54. In the months after Fallen Officer Kennedy's death, Plaintiff has requested reports, video(s), records, autopsy reports, in fact Fallen Officer Kennedy's entire file was requested from every organization that had contact with him, as well as video of the training itself and of the autopsy. Information has been requested from the APD, from the City, and from the Forensic Examiner's office. These requests have been either ignored or denied.

55. The City subsequently also denied Workers' Compensation Benefits to Kennedy, and refused to pay Kennedy any other benefits, including life insurance proceeds, despite the unquestionable fact that Kennedy's death was in the line of duty and in the course of his employment with the City.

## V. CAUSES OF ACTION

**A.      Claim against individual officers under 42 U.S.C. § 1983 for violation of Kennedy's Fourth Amendment right to be free from excessive force and Fourteenth Amendment right to bodily integrity.**

56. Defendants Williams, Bucek, Kurbinsky, and McNulty's actions on the occasion in question were under color of state law and excessive, wrongful, and intentional in depriving Kennedy of his clearly established constitutional rights and was not objectively reasonable under the circumstances as alleged more fully below.

57. At all times material hereto, Defendants Williams, Bucek, Kurbinsky, and McNulty had a duty to avoid infliction of unjustified bodily injury to Murriel, to protect his bodily integrity and to not trample on his constitutional rights, including the right to be free from the use of excessive force.

58. Defendants Williams, Bucek, Kurbinsky, and McNulty failed to act as a reasonable officer would have acted in the same or similar circumstances, particularly in a training scenario where there was never a risk of harm to the officers or others.  That is, Defendants Williams,

Bucek, Kurbinsky, and McNulty took turns "training" a single, barely trained, exhausted, injured Cadet and continuing to attack him by punching, body compression and refusing him respite or rest until he was rendered nearly unconscious and after he dropped an "officer in distress" card.

59. The excessive force used by Defendants Williams, Bucek, Kurbinsky, and McNulty was not reasonable, justified nor was it necessary under the circumstances. To the contrary, the actions were objectively unreasonable in a training session involving no risk of harm to any of the training officers or anyone else nearby.

60. In the process, Defendants Williams, Bucek, Kurbinsky, and McNulty's conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before Defendants Willis, McCarty and Land injured Murriel. At the time of the incident, the law of the Fifth Circuit was clearly established that that pushing, kneeing, slapping, or striking someone who is not actively resisting or attempting to flee, and who has been subdued, is excessive. *See Sam v. Richard,* 887 F.3d 710, 714 (5th Cir. 2018); *Darden v. City of Fort Worth, Tex.,* 880 F.3d 722, 727 (5th Cir. 2018); *Carroll v. Ellington,* 800 F.3d 154, 177 (5th Cir. 2015); *see also Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) ("clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation.").

61. The force used by Defendants Williams, Bucek, Kurbinsky, and McNulty was unnecessary and unreasonable under the circumstances, as Kennedy, an officer-trainee who was involved in a training exercise and was not attempting to harm anyone and pleading for the Defendant officers to stop, did not require the use of such excessive force.

62. Kennedy also had the right to be free of state-occasioned damage to his bodily integrity under the Fourteenth Amendment's guarantee of due process. *See Doe v. Taylor Ind. Sch. Dist.,* 15 F.3d 443, 450-51 (5th Cir. 1994); *see also Alton v. Texas A&M Univ.,* 168 F.3d 196, 199 (5th Cir. 1999). The conduct of Defendants Williams, Bucek, Kurbinsky, and McNulty as detailed above was so egregious and outrageous as to shock the contemporary conscience, and was unjustifiable by any governmental interest. It is clearly established that the use of extreme physical force by police officers satisfies this standard. *See Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex. rel. Keys,* 675 F.3d 849, 867-68 (5th Cir. 2012). Here, the use of force employed by Defendants Williams, Bucek, Kurbinsky, and McNulty was so extreme as to shock contemporary conscience—a "fight for your life" training should never be implemented in the literal sense. If a cadet is not qualified to meet the vigorous physical requirements of police work, killing or severely injuring him "violates the decencies of civilized conduct." It certainly constitutes a violation of Kennedy's right to bodily integrity.

63. As a direct and proximate cause of these violations of his Constitutional rights, as set forth herein, Kennedy and his survivors incurred extreme injuries for which Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**B.    Claim against individual officers under 42 U.S.C. § 1983 as supervisors or bystanders for violation of Kennedy's Fourth Amendment right to be free from excessive force.**

64. Defendants [bystander/supervisor officers] failed to act as a reasonable officer would have acted in the same or similar circumstances. All of the Individual Officer Defendants are likewise liable for Defendants Williams, Bucek, Kurbinsky, and McNulty's use of excessive force as either their supervisor or as a bystander. A claim of bystander liability requires the claimant to prove (1) the by-standing officer knew that a fellow officer was violating an individual's constitutional rights, and (2) the officer had a reasonable opportunity to prevent the violation, but

chose not to act. Supervisory liability requires a showing that the supervisor acted, or failed to act, with deliberate indifference to their subordinates' constitutional violations. Both supervisory and bystander liability under Section 1983 are based on the principle that, by choosing not to intervene and prevent an unconstitutional exercise of excessive force, the passive officer effectively participates in his fellow officer's acts.

**65.** All of the Individual Officer Defendants, like Defendants Williams, Bucek, Kurbinsky, and McNulty, knew that Kennedy was being subjected to unreasonable and excessive force during the "fight for your life" training but failed to ever step in to stop the training, check on Kennedy, or put an end to the training.

**66.** At all times, there was adequate time and opportunity for all of the Individual Officer Defendants to intervene to prevent the use of plainly excessive force and prevent Kennedy's death.

**67.** By choosing not to intervene, all of the Individual Officer Defendants effectively participated in Defendants Williams, Bucek, Kurbinsky, and McNulty's unconstitutional acts.

**68.** Since at least 1995, it has been clearly established in the Fifth Circuit that an individual officer is subject to bystander liability under Section 1983 if he or she knew a constitutional violation was being committed by a fellow officer and had a reasonable opportunity to prevent the harm. *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) (citing *Hale v. Townley*, 45 F.3d 914, 918 (5th Cir. 1995), for principle that "it was clearly established in the Fifth Circuit that an officer could be liable as a bystander in a case involving excessive force if he knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm."). Likewise, it was clearly established at the time of the incident that a supervisor is subject to liability under Section 1983 where the supervisor, with deliberate indifference, failed to act or otherwise prevent

the constitutional violations perpetrated by their subordinates. *See, e.g., Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

69. As a direct and proximate result of all of the Individual Officer Defendants' failure to prevent Defendants Williams, Bucek, Kurbinsky, and McNulty's violation of Kennedy's constitutional rights, Kennedy and his surviving family incurred extreme pain and injuries for which they seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**C.    Claim against individual officers under 42 U.S.C. § 1983 for violation of Kennedy's Fourteenth Amendment rights.**

70. Defendants' actions on the occasion in question were wrongful in depriving Kennedy of his constitutional rights. Defendants were aware that Kennedy was in a distressed situation and was having difficulties breathing. Kennedy pleaded with Defendants to stop the training and give him water.  Defendants refused, even knowing that Kennedy was in apparent physical and medical distress. Defendants' failure to provide Kennedy with timely medical attention resulted in Kennedy's death.

71. Defendants violated 42 U.S.C. § 1983 when they acted or failed to act with subjective deliberate indifference to Kennedy's serious medical needs.  Deliberate indifference exists when the official or officials refuse to treat Kennedy, ignore medical complaints, or intentionally provide the incorrect medical treatment.

72. The Fourteenth Amendment guarantees people the right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Dyer v. Houston,* 955 F.3d 501,506 (5th Cir. 2020) (citing *Thompson v. Upshur Cty., Tex.,* 245 F.3d 447, 457 (5th Cir. 2001) (citing, *inter alia, Estelle v. Gamble,* 429 U.S. 97, 103 (1976))).

73. Kennedy had a constitutional right to be provided medical care under the Fourteenth Amendment while in Defendants' custody. Refusing to treat Kennedy's complaints and obvious condition can give rise to Section 1983 liability. *Galvan v. Calhoun Cty.,* 719 F. App'x 372 (5th Cir. 2018); *Easter v. Powell,* 467 F.3d 459, 461-65 (5th Cir. 2006); *Harris v. Hegmann,* 198 F.3d 153, 159-60 (5th Cir. 1999); *Alderson v. Concordia Par. Corr. Facility,* 848 F.3d 415, 422 n.8. (5th Cir. 2017). The relevant question is whether the officers acted or failed to act with deliberate indifference to the person's needs. *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 648 (5th Cir. 1996).

74. Defendants failed to follow proper medical guidelines by refusing to get Kennedy the medical attention he desperately needed. Despite being aware that Kennedy required medical attention, Kennedy's obvious need for medical attention was ignored by Defendants.

75. Defendants' refusal to treat Kennedy were acts of subjective deliberate indifference that caused an unconstitutional delay in medical treatment which caused Kennedy's death.

76. Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. Defendants were aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Kennedy was unable to stand or walk at times, Kennedy's breathing was labored, he was begging for water, and eventually could not speak or form words. Ultimately, Defendants knew he was in need of an ambulance but did not call him one until he lost consciousness and his pulse. Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

77. Defendants drew this inference because they acknowledged that Kennedy needed an ambulance. Moreover, it was so obvious and the need was so apparent that even a laymen would recognize that care was required - as Kennedy is unable to stand, his breathing is labored, and he

became nonresponsive and incoherent prior to being taken into the break room. Thus, Defendants drew the inference that a substantial risk of serious harm existed.

78. Accordingly, Defendants were deliberately indifferent to Kennedy's health and safety because Defendants "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care or summoning medical care for Kennedy until it was too late. *Domino,* 239 F.3d at 756 (quoting *Johnson,* 759 F.2d at 1238).

**D.     Claim against the City under 42 U.S.C. § 1983 for violation of Kennedy's Fourth and Fourteenth Amendment rights.**

79. The City is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of the Arlington Police Department of which the City Council, the City Manager, the Mayor, and Chief of Police all had actual or constructive knowledge that was a moving force behind the constitutional violations alleged herein.

**1.     The City of Arlington failed to train its officers not to use excessive force in the training of its Cadets.**

80. Prior to September 22, 2022, the City's policymakers, specifically the Mayor, the City Council, the Chief of Police, and the City Manager knew or should have known that there was no training policy, or a woefully inadequate training policy, regarding Arlington cadets.  The failure to train reflects deliberate indifference by the City to the rights of the City's inhabitants and is actionable under 42 U.S.C. § 1983.

81. The City developed and maintained a policy of deficient training of its police officers who are in charge of training new police officers.  This training policy is either non-existent or is such that it actually and affirmative promotes the use of excessive, and potentially deadly, force

by officers when training new officer cadets, to a degree that the physical requirements are no longer for training purposes, but for hazing purposes.

**82.** The City knew that its training was inadequate because either it did not exist or because it actually promoted the use of excessive force during training. The City has, over time, received numerous complaints regarding the use of force during the training sessions like the one that resulted in the death of Kennedy. Those complaints put the City on notice that its training was not only inadequate but actually contrary to constitutional standards. In fact, in the cadet class that immediately preceded Kennedy's cadet class, a significant number of cadets quit the training because of the repeated and excessive use of force by the trainers. Yet, the City did nothing to change its training regimen or how its training officers were instructed to conduct the training. In doing so, or failing to act, the City was deliberately indifferent to the rights of its citizens. More problematic is that by not acting, the use of excessive force became—and remains—the de facto policy or custom of the City for training officers. This policy or custom was the moving force behind the death of Kennedy. As such, the City can be held liable for the constitutional violations carried out by its officers.

**83.** Despite knowing that its policy or custom actually promoted the use of force, the City did nothing to stop it. Moreover, knowing that its officers who carried out that training were using excessive force, the City did nothing to stop the practice and did nothing to discipline, reprimand, or otherwise correct the actions of its officers. In doing so, the City ratified the conduct of its officers, making the conduct the known and accepted policy and custom of the City. The City's failure to adequately discipline or correct its officers for this conduct is therefore the moving force behind Kennedy's death and Plaintiffs' damages.

> **2.    The City of Arlington failed to implement any training to recognize when cadets are in medical distress.**

**84.** There is a significant disconnect between the City's description of the training a cadet should expect and the training scheduled on the very sparse schedule promulgated by the Academy.

**85.** These documents were both published to the prospective cadets (city employees) and based on the evidence about the training cadets actually received, neither were followed.

**86.** The City, on its website, is clear about the training police cadets should expect to receive. [5]

    **a.** The list is brief but comprehensive:
        A.    Classroom (720 Mandatory hours from TCOLE -Texas Commission on Law Enforcement)
        B.    Scenario Training
        C.    Leadership Skills
        D.    Physical Training and Defensive Tactics
        E.    Professional Police Driving
        F.    DWI / SFST
        G.    Firearms
        H.    Written Examinations

    **b.** Note that the list specifies "Physical Training and Defensive Tactics". *Id.*

    **c.** There is no mention of "fight simulation", "fight for your life", wrestling, MMA or jiu-jitsu.

**87.** The Academy distributes a training schedule (*Exhibit C Class Schedule)* to all cadets once they are at the academy. This training schedule does not align with the training the City has on its website recruitment page. The training schedule provided to the cadets is, in addition to not aligning with the City's posted training, very vague. *Id.*

**88.** In the Academy's schedule:

---

[5] Police Academy Experience, Arlington Police Department, https://www.arlingtontx.gov/city_hall/departments/police/police_recruiting/police_academy_experience (last visited *April 3, 2024).*

      **a.** There is an activity called "Arrest & Control" which is held in the gym and likely involves some level of physicality- but by definition an arrest is an assertive act, and not "defensive". *Id.*

      **b.** At most "Physical Training" with instructor Jastin Williams is scheduled once weekly on Mondays. *Id.*

      **c.** There is no instance of "defensive tactics" on the schedule. *Id.*

**89.** Testimony from cadets will show that though nothing on the schedule indicated it, the week prior to the "fight for your life" the cadets were exposed to MMA and jiu-jitsu tactics labeled as "Radio Communications/Amber-Silver Alert/TCIC-TLETS" and "Arrest and Control".

**90.** The City had every opportunity to know that their published training schedule was not being implemented at the Academy. Further, the City should have also been aware of the schedule published by the Academy. Finally, the City was aware of the significant number of injuries to cadets at the Academy that generated a steady stream of worker's compensation claims.

**91.** "The failure of the city to respond with different training or better supervision reflects a deliberate or conscious choice to endanger constitutional rights." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.375, 381-83 (5th Cir. 2005).

**92.** The failure of the City to supervise the Academy and the instructors training programs such that multiple injuries were caused as a result and/or the Constitutional rights of employees were violated resulted in training so dangerous that Fallen Officer Kennedy was killed as a result of it is a violation of the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983.

**93.** Here, the instructors training Fallen Officer Kennedy were aware that he was injured, struggling to catch his breath, struggling to stand and walk, and incoherent. At least 1 officer saw him drop his "Officer in Distress" card.

**94.** The instructors' failure to assist Fallen Officer Kennedy rather than to continue physically attacking him and to threaten him with the removal of his livelihood after he was clearly harmed amounts to a deliberate indifference for his welfare.

**95.** Further, when the last fight was stopped, rather than attending to him and rendering immediate aid, Fallen Officer Kennedy was left on a chair that he fell out of when he stopped breathing. Following his fall there was a more than 5-minute period where Fallen Officer Kennedy was without oxygen. This means that for more than 5 minutes Fallen Officer Kennedy either received no CPR, or received CPR performed so poorly that it provided him with no oxygen.

**96.** This deliberate indifference to Fallen Officer Kennedy's welfare during and after the "Fight for Your Life" simulation is a result of poor training of the officers in the rights of Cadets specifically and citizens in general and in their responsibilities as instructors for the safety and well-being of the Cadets by the APD and the City and is exemplified by their use of Gracie University's inexpensive, brief, uncertified training.

**97.** The City was deliberately indifferent to the safety of Cadets when it permitted its instructors to implement the Gracie University training rather than providing the instructors with proper training that included safety and the provision of Cadet examinations and adequate skills to assist those Cadets who were injured.

**98.** The City was deliberately indifferent when they implemented, condoned, approved, and carried out a policy of conducting the "fight for your life" simulation training in such a manner that it directly resulted in the constitutional deprivations and illegal conduct complained of by Plaintiff in this cause of action.

**99.** The City was deliberately indifferent when they failed to correctly train the instructors such that they failed to provide immediate and correct supervision and aid when Fallen Officer Kennedy stopped breathing.

**E.    Claim against Gracie University for negligence and gross negligence.**

**100.** Gracie University had a duty to act in good faith and with ordinary care in the training for, design of and implementation of its "GST" program. Gracie University failed in their duty to act in good faith and with ordinary care when, after a mere 1 or 2 weeks of training, it sent instructors to their police departments with a certificate that stated they were prepared to train others in a proprietary form of jiu-jitsu that included full body weight compressions, choke holds, and body blows performed without protective gear.

**101.** Gracie University did not act as a reasonably prudent business would have under the same or similar circumstances when it allowed and encouraged police officers to use their proprietary form of jiu-jitsu, which they were essentially selling, despite its danger to those it was practiced upon when they were made to receive weight compressions, choke holds and body blows. *Exhibit L.*

**102.** Gracie University did not act as a reasonably prudent business would have under the same or similar circumstances when it certified instructors as ready to train others in jiu-jitsu combat simulations but failed to provide them with instruction in ringside medical care and the skills required to keep those they trained safe and free from injury.

**103.** The direct acts and omissions of Gracie University rose to the level of gross negligence.

**104.** Gracie University's failures to adequately train and certify the Arlington police officers to conduct the physical training exercises were direct actions of the corporation for which

Defendant can be liable for gross negligence. Further, these actions—committed by a vice-principal or manager of Gracie University —objectively involved an extreme degree of risk when viewed from the standpoint of Gracie University's vice-principal or manager, considering the probability and magnitude of the potential harm to persons like the Plaintiff. There can be no question that the properly training police officers to train cadets, particularly when that training involves the intentional and purposeful use of excessive force, involves an extreme degree of risk of serious injury to the cadets who are not accustomed to the application of physical force.

105. Gracie University's vice-principals or managers had actual, subjective awareness of the risks of their conduct, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff and others, allowing and certifying the police officers as experts in physical force training, knowing they were not prepared to do so without risking serious harm to the cadets. Gracie University's vice-principals or managers knew the training was being done in an unsafe manner and had the opportunity to de-certify the officers and stop the work prior to any injury to the Plaintiff, but failed to do so. In doing so, Gracie University —by and through its vice-principals or managers—authorized and ratified the doing and manner of the acts of its employees.

106. For these reasons, Gracie University is also grossly negligent and should be subjected to exemplary damages.

## VI. DAMAGES

107. **Actual damages**. Defendants' acts and/or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiffs and Defendants should be held jointly and severally liable for the following damages:

   a.   **Brittney Kennedy, as wrongful death beneficiary, individually as surviving spouse of Marquis Kennedy.**

1.  Mental anguish—the emotional pain, torment, and suffering experienced by Brittney Kennedy because of the death of her husband, Marquis Kennedy, that Brittney Kennedy sustained in the past and that will, in reasonable probability, sustain in the future;

2.  Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Brittney Kennedy would have received from Marquis Kennedy had he lived—that Brittney Kennedy sustained in the past and that she will, in reasonable probability, sustain in the future;

3.  Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value excluding loss of inheritance that Brittney Kennedy would have received from Marquis Kennedy had he lived—that Brittney Kennedy sustained in the past and that she will, in reasonable probability will sustain in the future.

4.  Loss of inheritance—the loss of the present value of the assets that Marquis Kennedy, in reasonable probability, would have added to the estate and left at natural death to his wife, Brittany Kennedy.

**b.  Brittney Kennedy, on behalf of M.S.K., a wrongful death beneficiary, as the surviving minor son of Marquis Kennedy.**

1.  Mental anguish—the emotional pain, torment, and suffering experienced by M.S.K. because of the death of his father, Marquis Kennedy—that M.S.K. sustained in the past and that will, in reasonable probability, sustain in the future;

2.  Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that M.S.K. would have received from his father, Marquis Kennedy had he lived—that M.S.K. sustained in the past and that he will, in reasonable probability, sustain in the future;

3.  Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance that M.S.K. would have received from his father, Marquis Kennedy had he lived—that M.S.K. sustained in the past and that he will, in reasonable probability will sustain in the future.

4.  Loss of inheritance—the loss of the present value of the assets that M.S.K., in reasonable probability, would have added to the estate and left at natural death to his son, M.S.K.

**c.  Estate of Marquis Kennedy (Survival Claim).**

1.    Conscious pain and mental anguish suffered by Marquis Kennedy prior to his death;

2.    Reasonable and necessary medical expenses; and

3.    Funeral and burial expenses.

**108. Punitive/Exemplary Damages against the individual officer Defendants**. Punitive/exemplary damages are recoverable under section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of individual officer Defendants was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of Murriel.  As such, Plaintiffs request punitive and exemplary damages from the individual officer Defendants to deter this type of conduct in the future.

**109. Punitive/Exemplary Damages against Gracie University**.  As described in more detail above, Gracie University's failures rose to the level of gross negligence, entitling Plaintiffs to exemplary damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

**110.** Prejudgment and post judgment interest.

**111.** Costs of court.

**112.** Reasonable and necessary attorney's fees incurred by the Plaintiffs through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

## VI. JURY DEMAND

**113.** The Plaintiff demands that all issues of fact in this case be tried to a properly impaneled jury.

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiff demands judgment against the defendant for general and special damages of twenty million dollars ($20,000,000), for their costs, for pre and post judgment interest at the legal rate, and for such other and further relief, both at law and in equity, to which Plaintiff may show themselves entitled.

DATED: May 13, 2024.

WITHERSPOON LAW

*/s/ Roland Witherspoon*
Roland Witherspoon
Texas Bar Number: 24086097
7290 Crosswater Ave.
Tyler, TX 75703
(903) 597-2500 (phone)
(866) 269-3770 (fax)
litigation@withlaw.com

and

Thad D. Spalding
State Bar No. 00791708
tspalding@dpslawgroup.com
Shelby J. White
State Bar No. 24084086
swhite@dpslawgroup.com
DURHAM, PITTARD & SPALDING, LLP
P.O. Box 224626
Dallas, Texas 75222
(214) 946-8000 - Office
(214) 946-8433 – Facsimile

***ATTORNEYS FOR PLAINTIFF***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **May 13, 2024**, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

Todd D. Ogden
togden@maronmarvel.com
John P. Parsons
jparsons@maronmarvel.com
MARON MARVEL BRADLEY
ANDERSTON & TARDY LLC
2001 Bryan Street, Suite 3050
Dallas, Texas 75201

Joseph F. Cleveland, Jr.
jcleveland@belaw.com
BRACKETT & ELLIS, PC
100 Main Place
Fort Worth, Texas 76102
*Attorneys for Defendant Gracie Global, LLC d/b/a*
*Gracie University*

Cynthia Withers
cynthia.withers@arlingtontx.gov
Joshua A. Skinner
joshua.skinner@arlingtontx.gov
Benjamin J. Gibbs
benjamin.gibbs@arlingtontx.gov
CITY OF ARLINGTON
CITY ATTORNEY'S OFFICE
Post Office Box 90231, MS 63-0300
Arlington, Texas 76004-3231
*Attorneys for Defendants The City of Arlington,*
*Texas, Arlington Police Department, D/B/A Arlington*
*Basic Police Training Academy, City of Arlington*
*Purchasing Department*

/s/ Roland Witherspoon
Roland Witherspoon